# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**SPACE GATEWAY SUPPORT, LLC,**

        **Plaintiff,**

**-vs-**                                                                       **Case No. 6:05-cv-208-Orl-DAB**

**INTERNATIONAL UNION OF SECURITY
POLICE FIRE PROFESSIONALS OF
AMERICA, and AMALGAMATED
LOCAL 127,**

        **Defendants.**

_____

## MEMORANDUM OPINION AND ORDER

This cause came on for consideration without oral argument on the following cross-motions filed herein:

> **MOTION:**    **DEFENDANTS' MOTION FOR SUMMARY DISPOSITION (Doc. No. 25)**
>
> **FILED:**     **June 24, 2005**
>
> _____
>
> **THEREON** it is **ORDERED** that the motion is **GRANTED** in part.

> **MOTION:**    **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 27)**
>
> **FILED:**     **June 24, 2005**
>
> _____
>
> **THEREON** it is **ORDERED** that the motion is **DENIED**.

*INTRODUCTION*

Plaintiff Space Gateway Support, LLC (herein "the Company") brought this action against the International Union, Security, Police and Fire Professionals of America, and its amalgamated Local 127 (herein "the Union"), seeking to vacate an arbitration award issued pursuant to provisions contained in a collective bargaining agreement. The Union has answered and counterclaimed for enforcement of the award. As set forth in the able briefs[1] filed by the parties, there are no factual issues in dispute and the matter is ripe for summary resolution. The Court has reviewed the motions and memoranda (Doc. Nos. 25-27, 29, 30), the incorporated exhibits, and the applicable law. For the reasons set forth herein, the Company's motion to vacate the award is **denied,** and the Union's motion to affirm the award is **granted, in part.**[2]

## *FACTUAL BACKGROUND*

The Court takes the following from the decision of the Arbitrator (Doc. No. 27, Exhibit D):

> The Company administers the Joint Base Operations Support Contract for NASA and the U.S.A.F. This includes providing grounds and plant maintenance and fire protection and security protection for the Kennedy Space Center, Cape Canaveral Air Force Station and Patrick Air Force Base. This Union represents a bargaining unit of Security Police Officers and Lead Security Police Officers. The Grievant in this case, Michael T. Waivol, was employed as a Lead Security Police Officer.
> A third shift Security Police Officer reported finding a Jack Daniels whiskey bottle in his vehicle when he reported for duty on January 28, 2004.
> The Watch Commander who reported for duty on January 29, 2004, decided to talk with the officers who used this vehicle on the first and second shifts on January 28, 2004, to see if they could provide any information concerning the presence of this bottle in a law enforcement vehicle. He decided to interview the first shift officer who

---

[1] The Court notes with pleasure the high degree of professionalism evident in the quality of the arguments presented and the tenor of the presentation.

[2] The Union requests, without supporting evidence or argument, costs and attorney's fees in an unspecified amount. Absent an asserted basis for attorney's fees, the Court declines to award same on summary judgment. As the prevailing party, the Union is entitled to costs as a matter of course.

was currently on duty before calling in the second shift officer. The first shift officer was the Grievant. He was asked if there was any problem of the previous day's shift or if anything unusual happened. He asked if it was the whiskey bottle. He stated he found the bottle in the restroom of the Port Gate and had placed it in his vehicle. He said he originally placed the bottle on the passenger seat but moved it to the organizer when he had to pick up a passenger. When asked why he did not report this bottle to a supervisor, he responded, "I don't know. I made a mistake." Since the Grievant's brother had recently passed away, the Watch Commander asked him if he was having any personal problems or needed any help. The Grievant stated there was no problem: he had just made a mistake by not contacting a supervisor and then forgetting the bottle was in the car.

When the Grievant went into the office to write his statement, Lieutenants Willoughby and Mastroianni told the Captain that they had detected an odor of alcohol on the Grievant. When the Grievant returned, they asked him if they could search his personal belongings in his assigned vehicle. He agreed and they did not find any improper items. They continued to smell the strong odor of alcohol and decide d to administer an intoxilizer test of the Grievant; they also asked him to turn in his weapons. The results of the intoxilizer test were .137 at 9:40 a.m,. and .141 at 9:43 a.m. A reading of .05 is considered as a level of impairment while in duty. The Grievant was kept under constant observation until 3:57 p.m. when he tested .041. The Grievant was required to turn in his I.D. badge and was placed on suspension. * * *

On Friday, February 6, 2004, a meeting was held in the Human Resources office for the purpose of receiving a verbal statement from the Grievant regarding being under the influence of alcohol on duty and drinking alcohol while on duty. * * * The Grievant stated he now realized he had a problem. He stated the whiskey bottle belonged to him and that he had been drinking while on duty one time previously. He stated his drinking habits escalated following the death of his brother which was followed by his mother moving in with him so he could provide care for her. He stated he had contacted Circles of Care on February 2, 2004, to seek help with his drinking problem. The Union stated they would be willing to allow the Grievant to be placed in a hardship assignment to Pass and Identification. The Company stated this would probably not be an option because it would require the Grievant to maintain his current weapons qualification, authorization to bear firearms, and a security clearance and certification under the NASA Personal Reliability Program (PRP).

On February 9, 2004, the Company sent official notification to the Grievant that his employment with the Company was being terminated effective February 9, 2004. It stated the termination was predicated on his being present and on duty on January 29, 2004, while under the influence of alcohol.

On February 18, 2004, the Grievant filed a grievance claiming the Company did not have just cause to terminate is employment and requested he be reinstated to duty and be made whole for any lost wages and benefits.

The Arbitrator noted that the Grievant's position as a Lead Security Police Officer entailed being responsible for directing the work of 9-12 Security Police officers, and that he was equipped with a law enforcement vehicle and "locked and loaded" rifles and handguns. Citing the increased security at federal facilities since September 11, 2001, the Arbitrator noted: "Obviously[,] the impairment of judgment and reactions caused by intoxicants could lead to serious consequences in this environment." Nonetheless, citing the Grievant's "spotless disciplinary record for his previous 15 years of employment" and his efforts at seeking rehabilitation for his alcoholism, the Arbitrator issued an award which reinstated Grievant to his former position, with no loss of seniority, but without reimbursement for lost wages or benefits. The Arbitrator ruled that Grievant was to be entered into the Company's EAP[3] and be subject to random drug/alcohol tests for a period of twelve months, and if he should test positive during this period, his employment "will be terminated." *Id.*

The following additional facts are undisputed and are taken from the parties' pleadings and papers.

Security Police Officers are required to maintain a security clearance and have unescorted access clearance under NASA's Personal Reliability Program ("PRP"). On January 30, 2004, NASA suspended Grievant's certification and security clearance under its PRP.

The parties were subject to a collective bargaining agreement ("the Agreement"), which incorporates the Company's Drug/Alcohol Free Workplace Policy ("the Policy") (Doc. No. 27, Exhibit A at Article 19; Exhibit B). The Policy prohibits employees from using alcohol on the premises or reporting to work with a system presence of alcohol or illegal drugs. The Agreement

---

[3]Employee Assistance Program.

notes that "disciplinary measures may be appropriate in circumstances involving misconduct, which may result from or be associated with the use of alcohol or drugs." *Id.*

In addition to the Policy, the parties have entered into an Agreement of Cooperation to assist employees through the Employee Assistance Program (Doc. No. 27, Exhibit C). The Agreement of Cooperation is designed to "help employees who become afflicted with alcoholism or drug dependency" by establishing "a system for early identification of the dependency problem and referral of that employee for appropriate treatment and concerned follow-up care." The Agreement of Cooperation details a system whereby an employee may seek help for a drug or alcohol problem, and provided certain conditions are met, the employee may be offered the opportunity to enter a rehabilitation program. Seeking help "shall not be used as a basis for disciplinary action" provided the help is requested prior to a positive drug test and the employee successfully completes the program. The Agreement of Cooperation provides for random drug testing, and states that an employee who tests positive will be removed from his/her job, required to submit to the EAP and will be permitted to return to work upon completion of the program, a negative subsequent test, and further conditions. *Id.*

The Agreement provides for an arbitration procedure:

> Findings and decisions of the Arbitrator shall be stated in writing . . . All decisions of the Arbitrator within the scope of this provision shall be final and binding upon both the Company and the Union.

(Doc. No. 27, Exhibit A at Article 17).

Further, the Agreement provides that, in discipline or discharge cases, "the Arbitrator shall have the power to judge the degree of guilt or innocence of the employee" and, in the event an

employee is not exonerated, "the Arbitrator shall have authority to establish an appropriate remedy if the original action taken by the Company is deemed too severe." (Article 17).

Following the issuance of the Arbitration Award, the Company did not reinstate Grievant. The Company asserts that it has properly refused to reinstate the Grievant on the grounds that he has no PRP, his reinstatement would violate the Company's contractual rights and obligations, and because the Arbitrator's Opinion and Award "did not draw its essence from the parties' negotiated agreements." (Doc. No. 27).

### *SUMMARY JUDGMENT STANDARD*

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. Pro. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

### *ISSUES AND ANALYSIS*

We begin with the well-settled rule that judicial review of labor dispute arbitration awards is limited, in recognition of the federal policy of settling such disputes by arbitration. *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. *United Paperworkers International Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). As noted by the Union, as long as the Award "draws its essence from the collective bargaining agreement" and is not merely the Arbitrator's "own brand of industrial justice," the award is legitimate. *Steelworkers*, 363 U.S. at 597, 80 S.Ct. at 1361. *See also Drummond Coal Company v. United Mine Workers of America, District 20,* 748 F.2d 1495 (11th Cir. 1984) (courts are not to engage in a review of the merits of the award, but are limited to determining whether the arbitrator was functioning within his authority).

Although courts are not to engage in a *de novo* review of the merits of the award, a court has the authority to vacate an award that violates well-established public policy. *See Eastern Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62-63, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (recognizing public policy grounds for vacating an arbitration award); *Delta Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665, 674 (11th Cir. 1988) (affirming decision vacating arbitration award that reinstated airline pilot who flew while intoxicated because "what [the pilot] did as performance of his employment [was] the very thing which offends public policy."). In order to serve as legitimate grounds for vacating the award, the public policy must be "explicit, well-defined and

dominant" and "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest." *Eastern Associated,* 531 U.S. at 62.

Here, Plaintiff asserts that the Award violates public policy and fails to draw its essence from the Agreement. Defendant maintains that the Award is final and binding, and should be enforced per the Agreement. We treat each, in turn.

**Public Policy**

Plaintiff contends that the reinstatement of the Grievant violates established public policies "aimed at preserving public safety, security, and national security." (Doc. No. 27) Specifically, Plaintiff cites to: 1) The Civil Space Employee Testing Act of 1991; 2) federal case law holding that disability discrimination laws do not protect law enforcement personnel from adverse action, based on their alcoholism; 3) case law upholding the validity of drug testing for law enforcement personnel; and 4) drunk driving laws and case law prohibiting operation of a motor vehicle while impaired; in addition to the Policy and the Agreement of Cooperation, all recognizing the dangers of substance abuse. As will be seen, however, although the law and precedents recognize the dangers of substance abuse in the workplace, the law also recognizes the goal of rehabilitation and the desirability of getting the employee into treatment, rather than an absolute dismissal in all cases. Indeed, none of the laws cited by Plaintiff provide for automatic termination of an offending employee. Rather, a review of the precedents cited by Plaintiff reveals a public policy that *allows* for termination of offending employees, but does not *require* it.

The Civil Space Employees Testing Act of 1991 ("Testing Act"), 42 U.S.C. § 2473c, requires NASA contractors, such as the Company, to implement drug testing and/or reporting requirements for its employees. The Testing Act provides that:

> Any such individual determined by the Administrator under this section to have used, in violation of applicable law or Federal regulation, alcohol or a controlled substance after December 9, 1991, who-
> (A) engaged in such use while on duty;
> (B) prior to such use had undertaken or completed a rehabilitation program described in subsection (e) of this section;
> (C) following such determination refuses to undertake such a rehabilitation program; or
> (D) following such determination fails to complete such a rehabilitation program, shall not be permitted to perform the duties which such individual performed prior to the d

*Id.* at § 2473c(d)(2).

This is certainly, as argued by Plaintiff, evidence that public policy is strongly against alcohol abuse among employees of NASA contractors. The Act, however, *also* states: "[R]ehabilitation is a critical component of any testing program for abuse of alcohol or use of illegal drugs, and should be made available to individuals, as appropriate." 42 U.S.C. 2473c(b)(7).[4] Moreover: "In prescribing regulations under the programs required by this subsection, the Administrator shall require, as the Administrator considers appropriate, the suspension, disqualification, or dismissal of any employee to which paragraph (1) or (2) applies, in accordance with the provisions of this section, in any instance where a test conducted and confirmed under this section indicates that such employee has used, in violation of applicable law or Federal regulation, alcohol or a controlled substance." 42 U.S.C. 2473c(c)(3). Thus, the Testing Act does *not* provide a zero tolerance, dismissal-in-all-cases scenario for offenders. Rather, as here, the Administrator[5] is vested with discretion to "suspen[d], disqualif[y], *or* dismiss" "as the Administrator considers appropriate." [emphasis added].

---

[4] Note, too, the numerous references to rehabilitation programs in the excerpt quoted above.

[5] The Court notes Defendant's argument that the Testing Act refers to obligations of the Administrator, and not the Company. As the Court does not find the Testing Act to be dispositive to the issue of public policy, it need not reach this issue. For present purposes, the Court assumes that the Company is obligated to honor the regulations of the Administrator.

This dual emphasis on discipline and rehabilitation is consistent with the Policy and the Agreement of Cooperation, as well. As is clear from the excerpts of these agreements cited above, neither of these negotiated agreements provides for automatic dismissal for offenders. To the contrary, the Agreement of Cooperation provides for a return to work for employees who have completed rehabilitation programs, and met other conditions.

Nor is the Court persuaded by the case authority interpreting the Americans with Disabilities Act, upholding drug testing, or the state laws prohibiting and punishing intoxication while driving. These precedents stand for the readily acceptable proposition that substance abuse is incompatible with law enforcement activities and operating a motor vehicle. That, however, is not the issue. The issue is the appropriate response to an employee who has violated the underlying policy of no alcohol at work. Here, the public policy of dealing with an employee who abuses substances appears to be a "hate the sin, love the sinner" approach; suspending the employee, while at the same time emphasizing treatment and ultimately, rehabilitation and return to work. That is precisely what the Arbitrator envisioned with respect to this Grievant. Absent a showing that it is public policy to fire all errant employees in every instance involving use of alcohol at work, the Court cannot find that the Award violates existing public policy.[6]

Although Plaintiff relies heavily on *Delta Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665, 674 (11th Cir. 1988), the Court does not read *Delta* as mandating a different result. *Delta* involved a pilot who operated an airplane while legally drunk. The applicable FAA regulations

---

[6]The Court notes that it is not condoning the abuse of alcohol, or holding that all employees are entitled to one free pass at drinking on the job. The Court agrees with the general proposition that substance abuse presents unique risks to the public when the abuser is a law enforcement officer, and that the abuse of alcohol is inconsistent with the mission of law enforcement. Indeed, if the Court were sitting as Arbitrator in this matter, it may well have found this consideration sufficient to deny the Grievance. As set forth above, however, the merits of the Grievance is not before the Court.

unambiguously prohibited the operation of an aircraft while under the influence, and Delta's policy specifically provided that "[a]ny evidence of the use of alcohol or other drugs which is apparent at the time of reporting for flight duty, also constitutes cause for discharge." *Id.* at 668.  The Eleventh Circuit stated the issue thus:

> "The question we are instructed . . . to ask is not, "Is there a public policy against the employee's conduct?", but, rather, "Does an established public policy condemn the performance of employment activities in the manner engaged in by the employee?"

*Id.* at 671.  Finding that it did, and that the arbitrator's finding of no just cause for discharge conflicted with that policy, the Eleventh Circuit affirmed the district court's order vacating the award. *Id.*

Here, by contrast, the Agreement between the parties notes that "disciplinary measures *may* be appropriate in circumstances involving misconduct, which may result from or be associated with the use of alcohol or drugs" [emphasis added], and the Policy and Agreement of Cooperation do not set forth alcohol usage as cause for automatic discharge.  In fact, as quoted above, the Policy encourages alcohol abusers to ask the Company for help and provides that seeking help "shall not be used as a basis for disciplinary action."

Moreover, while the Eleventh Circuit's inquiry was whether an established public policy condemned the performance of employment activities in the manner engaged in by the employee, the United States Supreme Court, in a more recent case, put the question differently:

> [T]he question is not whether [the grievant's] drug use itself violates public policy, but whether the agreement to reinstate him does so.

*Eastern Associated Coal Corp. v. United Mine Workers of America,* 531 U.S. 57, at 62-3 (2000).  In *Eastern,* a labor arbitrator ordered an employer to reinstate an employee truck drive who had twice tested positive for marijuana.  *Id.* at 59.  The Supreme Court addressed many of the same arguments

-11-

made by Plaintiff here, interpreted similar statutory language, and determined that considerations of public policy did not require courts to refuse to enforce the arbitration award. *Id.* This Court finds the reasoning of the Supreme Court applies with full force to the instant case. Here, the decision to reinstate the Grievant is consistent with public policy favoring rehabilitation, as well as the Policy and Agreement of Cooperation, which provides for a return to work, following successful completion of the EAP program and continued testing.[7] Viewed thus, the decision to reinstate Grievant, with the conditions noted, is not against public policy.

### The Essence of the Agreement

Plaintiff next contends that the Award must be set aside because it fails to draw its essence from the parties collective bargaining agreement in that the Arbitrator considered post-discharge conduct and disregarded the Company's exclusive right to impose discipline.

As set forth above, an arbitrator is "confined to interpretation and application of the collective bargaining agreement: he does not sit to dispense his own brand of industrial justice." *Steelworkers,* 363 U.S. at 597. Plaintiff contends that the Arbitrator failed in that obligation by basing his decision on the Grievant's post discharge rehabilitation efforts, citing, *inter alia*, *Butterkrust Bakeries v. Bakery, Confectionery & Tobacco Workers,* 726 F. 2d 698, 700 (11th Cir. 1984) (arbitrator lacked authority to determine whether post-discharge completion of a Dale Carnegie course entitled employee to be reinstated). We note, however, that "post discharge" is not the same as "post suspension." Here, the record reflects that Plaintiff sought help at Circles of Care on February 2 – a week prior to his discharge and prior to the February 6 meeting at Human Resources. Plaintiff cites

---

[7] Indeed, Plaintiff's position that continued employment of a drug abuser is against public policy is markedly inconsistent with its own agreements with the Union, whereby employees who have substance abuse issues can seek help, with no disciplinary sanction, and return to work upon completion of the program.

no authority for the position that the Arbitrator was not allowed to consider these efforts made prior to the decision to terminate his employment.

Further, the decision was not based solely on consideration of the Grievant's rehabilitation efforts. Rather, as noted in the Award:

> Unrebutted testimony established that the Grievant had a spotless disciplinary record for his previous 15 years of employment. It is established that he was well respected by his supervisors and peers. It is also established that the Grievant was a very conscientious and competent Police Officer.

It was "because of the Grievant's excellent prior record," as well as his dedication to seeking recovery that the Arbitrator saw fit to reinstate him. Award at 11.

Moreover, *Butterkrust* is readily distinguishable from the case at bar. In *Butterkrust,* the Arbitrator made a finding of just cause for discharge, but determined that successful completion of the course would mitigate this finding, and allow for reinstatement of the employee. 726 F. 2d at 699. Here, there was no finding of just cause for discharge.[8] In *Butterkrust,* as noted by the Eleventh Circuit, "[t]he terms of the collective bargaining agreement provided that Butterkrust was to retain sole control over employee discipline." 726 F. 2d at 700. Here, however, although "the suspending, the discharging, or otherwise disciplining of employees are the exclusive functions of Management" the Agreement also provides that, in discipline or discharge cases, "the Arbitrator shall have the power to judge the degree of guilt or innocence of the employee" and, in the event an employee is not exonerated, "the Arbitrator shall have authority to establish an appropriate remedy if the original action taken by the Company is deemed too severe." (Article 17). Thus, *this* Agreement is much broader than that interpreted in *Butterkrust.*

---

[8] Indeed, the Award is ambiguous, with the Arbitrator "partially granting" the Grievance, by reinstating Grievant, but with no back pay or benefits for the suspension period.

This extraordinary grant of authority belies Plaintiff's next contention — that it alone has the right to discipline its employees. Having agreed to give wide authority to the Arbitrator to both determine just cause for discharge *and* to judge the appropriateness of the discipline, the Company can not be heard to complain when the Arbitrator does exactly that. Indeed, as pointed out by the Union, the fallacy of Plaintiff's position that it alone has authority to determine discipline is readily apparent. If true, *all* discipline would be virtually unreviewable by an arbitrator, and the above bargained for language would be meaningless.

The Award draws its essence from the Agreement and is not inconsistent with established public policy. To repeat, contrary to Plaintiff's conflating argument: while ordering that an employee be allowed to work when drunk would violate public policy, an order to reinstate an employee undergoing rehabilitation does not. The Court sees no basis to overturn the Award. The Union's motion is **GRANTED, in part;** the Company's motion is **DENIED.** The Court hereby orders that the Award be enforced, and the Grievant reinstated, pursuant to the terms of the Award. The Clerk is directed to enter judgment in favor of the Defendant, as set forth herein, and close this case. Any motions for attorney's fees shall be brought within the time limits set forth in the Local Rules.

**DONE** and **ORDERED** in Orlando, Florida on September 1, 2005.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record